The next case on our call of the docket is agenda number 18, case number 110012 and 110198, Gaffney v. Board of Trustees of the Orland Fire Protection District, et al. Counsel are you prepared to proceed? Thank you. Mr. Chief Justice, fellow Justices, good morning. My name is Thomas Duda. I represent the plaintiffs in these two consolidated appeals. May it please the court and counsel. There are two issues in this case. The first is one of statutory interpretation as to whether or not firefighters who are catastrophically injured in live fire realistic training scenarios are to be paid health insurance premiums on their behalf and behalf of their families under the provisions of the Public Safety Employee Benefits Act, under a provision that says that the premiums are to be paid when a catastrophic injury occurs when a firefighter is injured while responding to what he reasonably believes to be an emergency. A second issue in the Gaffney case, because there are two consolidated appeals, Lieutenant Lemoness and Firefighter Gaffney, the issue in Mr. Gaffney is whether procedurally in his particular case an administrative mechanism was at all imposed between his injury and his entitlement to the benefits and secondly in future cases whether such a procedure is legal under Section 20 of the same statute. The parties have spent hundreds of pages outlining the nuanced facts of these two cases, but the reality here is that both firefighters were injured while they were performing tasks under highly structured emergency scenarios. In Lieutenant Lemoness's case he was performing duties which were recreating a fire scene where a fatality occurred in Phoenix, Arizona in a supermarket fire. Officer Firefighter Gaffney's situation was somewhat more generalized, but in Mr. Gaffney's situation there was an actual fire, there was actually smoke in the building, and the hazard that eventually led to his disability was an unanticipated hazard. Mr. Duda, are these firefighters responding to what is reasonably believed to be an emergency or them responding to a job duty that was reasonably believed to be a training session? I think both. And I'm not trying to pick words. The situation That would matter, right? I mean, that is really the issue, isn't it? It does matter. I can envision, and I wanted to, part of my argument, advise the court, we are not arguing that every training scenario that firefighters engage in fall under the purview of reasonable belief that they're submitting to an emergency. What I'm saying is when the training scenario is orchestrated in a way to create a sense of urgency, to create unforeseen and unforeseeable circumstances, and place these firefighters in positions of physical and health risk, those training exercises become emergency situations and are covered by Section 10B of the statute. I can envision training that goes on where firefighters practice tying various types of knots. I can envision tabletop training sessions. I can envision routine maintenance that would not trigger the application of this situation. But these circumstances were extreme. And most importantly, the firefighters, in terms of their reasonable apprehension of what they were facing, were under strict orders to treat these scenarios as being real life emergency situations. I don't want to put too much emphasis on that. In fact, that was the case. But by their very nature, the purpose of these exercises is to create an emergency to improve firefighters' skills when other community emergencies occur so that they can perform their duties in a highly competent fashion. The fact that these particular firefighters were expressly told, you are to consider this to be an emergency, is extremely significant. But even if they weren't expressly told that, the nature of these scenarios is that they create emergency situations. Is this an objective test or a subjective test? I think it's subjective. And in whose mind? In the mind of the firefighter. And it's a subjective test. And I think that the question would be whether the subjective perception of the firefighter is reasonable. You know, I'm thinking of the case where a pilot is in a simulator, right? I don't think that's the same as this. Well, let me ask the question. Then you can tell me why I didn't think you'd think it's the same as this. But I, you know, you have a simulation and they're put in a simulator. They're being told, you're going to encounter emergency situations. You know, the plane might be subject to a crash. I mean, the heartbeat races, I would imagine, they go through it. But do they enter the simulator with the idea that it's an emergency situation? You know, I would say probably the answer to that is no. So now my question is, why is this different than this? Because a pilot in a simulator is not exposed to physical risk. The crash in a simulator isn't real. The external hazards that the pilot is exposed to is purely virtual. In these cases, both of these firefighters were exposed to intense physical risk. Firefighter Gaffney was in a burning structure. There was smoke in the structure. He was responding to an actual alarm. He responded with lights and sirens operating. And as Justice Gordon, the dissenting opinion, pointed out, firefighter Gaffney's injury was really not part of the training scenario. The training scenario was that he was to rescue a victim on level two and proceed to level three to extinguish the fire. His fire hose became entangled in a piece of furniture that he didn't know about. This was unforeseen. That's the argument that the appellants make continuously here is somehow these firefighters knew what to expect. They had no idea, they had a general idea of what to expect, but the particular hazards they were not aware of. Firefighter Gaffney's hang up of his hose was separate and independent from the training exercise in and of itself. He didn't know what the hang up was. So to answer your question, Your Honor, I did somewhat go into a tangent, but to answer your question directly, your pilot would not be exposed to those kinds of physical hazards and, in fact, was exposed to no physical hazard of any kind. Sir, I'd like to go back a little bit. What is the proper means for obtaining review of the board's decision to grant or deny the benefits under the section 10B? Declaratory judgment, period. Is there a question about this? In my opinion, there isn't a question. In the Gaffney case, we, in the Gaffney case, the appellant's argument is quite interesting because their response to the verbal representation by the lawyer in the presence of the full board, because I raised this issue. And I raised this issue because this isn't the only case I've handled. I mean, I have a whole plethora of these where I'm faced with these, quote, administrative hearings where the, quote, village manager is going to give me a, quote, impartial hearing. And so I'm very sensitive to this. And in the presence of the full board, it was said on two separate occasions, this is not a formal hearing under any legislation. There was no mention at that time of any ordinance. And there was no mention that there would be any sort of administrative decision that would be subject to deference under the writ of certiorary procedure. Let's go back to this. Did you answer? I don't know. I think I answered your question, Your Honor. If I went too far, I apologize. Let's go back to the simulator for a minute, using the language of the statute. The officer or firefighter's response to what is reasonably believed to be an emergency. Now, is it reasonable to, and again, the whole simulator idea. Isn't this a simulation of an emergency? Is it reasonable for the officer to think of this as an emergency when he's going to a site, smoke or not, to rescue a dummy? I mean, is that an emergency situation? Is that reasonable to say that this is an emergency situation, I'm going to rescue a dummy? My answer to that is yes on two levels. Okay. It's yes as far as I'm concerned in terms of common sense. And it is certainly yes as far as the definition of the term emergency that both parties have briefed extensively to this court. The International Dictionary definition of emergency has been ad nauseum quoted to this court by citing to it DeRose versus the village of Highland Park. But if you go through the prongs of that definition, all of the behaviors in both of these cases meet the definition of emergency. The DeRose court said that an emergency is something that requires, let's see, I wrote this down, I want to say it correctly, that it is the performance of duties that need to be done urgently and there is a need for immediate action. That is absolutely true in both of these cases. It's true because A, they were ordered to do it urgently, immediately, and with prompt attention. But with a person, their pass alarm going off, my client is told that the victim could be running out of air. He has to get in there immediately, rescue the victim, pull him from the building. And of course, the person who is running this test never bothered to tell my client that none of the RIT, Rapid Intervention teams who actually performed this activity were ever successful in removing the victim. But certainly, Mr. Leminis and Mr. Gaffney were operating urgently in a manner that required What was the second part of what you read, though? I'm sorry? What was the second part of what you read? And? There was a need for action. Is there a need for action to rescue the victim? Absolutely. There's a need for action to rescue the dummy? Absolutely. That's the purpose. That's the whole point. That's what they were doing. I mean, this is not a situation where everyone was told, you know, guys, this is just a, don't take this too seriously. You know, this is just pretend. And the reason that it's We don't have a situation, Mr. Duda, that if, let's say, there's the exercise being in one building with the smoke and the dummy. Yes. And the firefighter's on hand to go ahead. We've got this training exercise. Go in there and rescue that dummy, right? There's a need to rescue the dummy. And a fire starts in the building next door with a real person in it? I mean, can you perceive of the dispatcher saying, scrap the training exercise. We have an emergency next door? Yes. Right? Absolutely. But from your standpoint, But your honor, that happens. Let's say there's a fire going on in one building. And there's a fire across town. It's very common for the dispatcher to remove equipment from one's location and dispatch it to another and to enlist mutual aid. I understand that in the example you gave to me, the danger to the property and person of the community citizen would take precedence over the emergency scenario. But that doesn't make the scenario any less of an emergency. In the appellate court below, one of the questions that the justice has asked, and I really thought about this, I'm going to volunteer this, is isn't it always the case when you go into a training situation that you are far less apprehensive and the pressure is really off as compared to a real fire? And that's really not true. When I think about the firefighters I've represented who are injured in fire situations, I can think of a firefighter who suffered a catastrophic injury, got to the house. It was apparent that the fire was in the kitchen. He put on his turnout gear. He and one other person went up to this place, put out the fire. And while he was letting the smoke out of the building, he inhaled smoke and it ended his career. There's no question that's an emergency. But the level of emotional investment that that Evanston firefighter had in extinguishing a kitchen fire was far less than either of the plaintiffs in this case. The emotional investment of Lieutenant Leminis was intense. I mean, he said, this guy's down. You are to go in there. He's running out of air. You have to rescue him. And when he was asked, did you believe that he would die, Officer Leminis on page 436 of the record testified, it was my understanding that the intent was I was to consider him as running out of air. So I understand the distinction, but it's a distinction that does not have the legal difference that the defendant, that the defendants would like to exist in this case. Counselor, is the statute ambiguous? Yes. So we get to legislative intent? Yeah, I think legislative intent is always, I mean, our goal of legislative statutory construction is to develop legislative. The question is whether it's ambiguous enough to look to external sources. Exactly, that's the question. And the external sources are that the exact wording of the statute was not addressed by the General Assembly. The General Assembly did not expressly talk about the word emergency in their statements. But clearly the intent of the legislation as a whole was made very clear as set forth by the Supreme Court in Croy and as set forth by the descending opinion in Daphne and as set forth in my brief to this court that the General Assembly was not looking for narrow and strict construction. Their concern was when firefighters are responding, reasonably responding to what they perceive to be an emergency. And it ends their career and they are now saddled with a loss of income. They are saddled with a pre-existing condition that depending what happens nationally may or may not ever be covered by health insurance that the sacrifice physically made by the firefighter isn't compounded by their inability to sustain themselves and their families in terms of getting health insurance protection. But this doesn't impact whether he gets a line of duty disability, does it? Both firefighters were already granted line of duty. Right, I mean, I thought this was separate and apart. It is. It has to do with the insurance coverage. It is. Thank you. And I do acknowledge that the term in the line of duty is not coextensive with a reasonable belief that they're responding to an emergency. I realize that the second term is narrower than the first term, but it is nowhere near as narrow as the defendants would have the court believe. To go on to the definition of emergency and DeRose, because I only, there were like three different alternate linguistic formulations. The second was that an emergency was the result of an unforeseen combination of circumstances that call for immediate action. And the facts of both these cases are directly on point. In Firefighter, in Lieutenant Leminis' situation, a hood was placed over his mask so he was completely blind. It's not that he had impaired vision, he had no vision. He was, all of the participants were, quote, affirmatively disoriented. And although they were told the general location of the victim, they were not told exactly where the victim was. They were not told that the techniques that they standard, that they employed as a standard measure had always failed because there's a significant difference between a residence and a industrial setting. So these are unforeseen circumstances and they require immediate action. By the definition of emergency that seems to have been the operative term in this case through DeRose, the facts of this case fit the definition perfectly. Perfectly. Is there no import to the fact that, well, let me put it this way. If they, I tend to see your argument better if they were not told this was an emergency situation. If Gaffney and Lemins were saying, go into that building, or not knowing that it was a training situation, rather. In this case, they were fully aware it was a training situation. And that makes no difference in your argument, right? There's no distinction between, get in that building, somebody's in there, it's an emergency, go in there, and saying, hey, it's a training exercise, we've got a dummy in there, we're gonna have some smoke. Go in there and save that dummy, as if it was an emergency. Well, in Gaffney's situation, he really fits under the independent intervening accident that the defendant cites frequently in their argument. But no, I don't think it makes a difference, because even though it was a quote training exercise, they were expressly told, in accomplishing this exercise, you are to treat this as an emergency. Well, that was kind of the distinction in DeRose, right? I mean, that was a false alarm in which they didn't know it was a false alarm. There was no human interaction in DeRose. In DeRose, there was a mechanical false alarm and police officer DeRose went to investigate. He slipped and fell and suffered a catastrophic injury. Right, but he did not know it was a false alarm. Oh no, absolutely. Right. That's true. But there was no external circumstance that would suggest to police officer Rose that there was an emergency. I mean, he went to the scene, he didn't have lights and siren going. He meandered his way over there. When he got there, there was no immediate activity. I'm not trying to say DeRose was wrongly decided. But what I'm saying is, is that there was no objective criterion in DeRose to suggest there's an emergency. And in these cases, the record is replete with evidence that there was emergency circumstances. Mr. Duda? Yes, Your Honor. My time is up, so I'd be glad to answer the Justice's question. I just wanted to know, are the firefighters in these training exercises required to complete the exercise? Absolutely. And are there penalties if they don't? I mean, what if one of them said, I really just don't want to, I can't go any further, or one of those circumstances. Unless they're injured to the point they can't complete the exercise. If they're physically unable to complete the exercise because they're injured, then there would be no consequence. If they simply freaked out, got scared, and said, you know, this is way beyond me, they would be disciplined. And for instance, in Firefighter Gaffney's case, he didn't complete the exercise because he injured his shoulder. Firefighter Levinas injured his knee and left the scene, examined his knee, and decided the injury wasn't bad enough. He went back in, which is pretty typical firefighting behavior. Thank you, Your Honors. I appreciate your time and attention. Thank you. I do reserve the 10 minutes. Yes, good morning, Your Honors. May it please the Court, I am Lance Molina, counsel. I stand before you with a very different view of the record than Mr. Duda, but that isn't the first time that has happened. The key to this, in my view, to start analyzing the actual issue of whether benefits should be awarded under the statutory construction issue that is before you, begins by looking at the statute itself and the benefit itself. Your prior decision in Crohe dealt with the first portion of this statute, which ties in with pension benefits. It provides that police officers, firefighters, correctional officers who are catastrophically injured or killed in the line of duty get this health benefit. This health benefit, though, then goes on to be awarded in subsection B with a big however, however the benefit shall only be awarded if these limited circumstances occur. This is an extra special benefit. It goes beyond line of duty disability benefits, and it is a far differently funded benefit as well. It is a benefit where there aren't regular payments to a pension fund by employee and employer that are invested and are grown over the years, and then there are various reasons that claims are made and are paid out. This is a separate benefit that is given in limited circumstances, funded exclusively by local government, and in limited circumstances. And if you look at the distinction between A and B, A ties in with line of duty disability. Were you on the job when you were disabled or killed? B talks about line of duty disability in certain limited circumstances. And we focused in the briefs on the definition of emergency, and there have been cases that have, since 2008, looked at that term. But if you look at all the limited circumstances, the four, fresh pursuit, unlawful act of another, in the course of a criminal investigation, or in this case, responding to what is reasonably believed to be an emergency, I submit to you that what you get is a situation where you have the disability or death occurring on the mission, on the mission of the department, whether it's a police department or whether, in this case, firefighters, on the mission of doing public safety. Line of duty disability that is covered generally under subsection A, cover those situations, but they also cover all the other duties of a department that fall under preparation, because everything firefighters do when they are on duty and doing their tasks is preparation to protect the public, to do the mission of protecting the public. And I submit to you, when you look at it in that context, and you look at reasonable belief that you're responding to an emergency, that a training exercise is part of the preparation, it's not the mission. It's preparation to do the mission. And there can be training for those other portions of the mission where this limited benefit is given. There will be training as to how a police officer is to conduct the fresh pursuit. How is this done? Well, there has to be training, because it's dangerous. It's part of the mission that's dangerous. Are we going to award this benefit if someone is injured in learning how to do a pursuit? I submit to you not, even though it does involve danger. Doing fire inspections can be dangerous. Going up on ladders to look at things can be dangerous. Those things are not covered by this statute. This statute is equivalent, or subsection B, this benefit is for those firefighters in this case, in these cases I should say, that are in a situation where they are on the mission, they are on a call, and they are very unfortunately injured. Every firefighter injury is very unfortunate. Those that are covered by this statute and those that are not. But this one is reserved for those that are on the mission. And in these cases, both Firefighter Gaffney and Firefighter Leminis were not on the mission. They were preparing for the mission. As you heard, the one scenario was set up to recreate an actual situation in Phoenix where a firefighter was killed in responding to a fire because of a situation that arose that wasn't handled in a way that maybe it could have been. And so the scenario was set up to try to protect the firefighters in the future for those situations where this kind of thing might occur again. These training exercises are not inherently dangerous. They're designed to simulate danger. Do they involve some danger? Certainly, because all their duties do. But live fire burns are something that Citizens Police Academy trainees, that are citizens who go through these academies throughout the state of Illinois, do. They put them into live burns. Controlled burns, where a fire is going, and where there's a real live fire hose in a structure that's set up. There's real smoke. The gear, you wear the gear. They go in. It's because it's training. You're not gonna send those people to go fight a fire and save the public. Absolutely not. The training is fundamentally different. It's fundamentally different and it's a difference that stands up in the light of common sense, a general approach. I submit to you that this language is not unclear. It does not need any kind of legislative history in order to determine what a reasonable belief is that you are responding to an emergency. Can a training exercise produce a situation that is urgent and calls for immediate action? It absolutely can. So you're not saying that it's a training exercise, it's the end of the story. No, no, absolutely not. A training exercise can turn into a call for help. For example, firefighter Gaffney, if he wasn't able to get out, if he had been injured very severely where he couldn't move, he's in a smoke-filled structure at that point where the love seat is. If he's not available, no one knows where he is, the people that rush in to find him at that point are responding to what they reasonably believe is an emergency, I submit to you. What is a firefighter going to think? We're on this training exercise, one of our guys is unaccounted for, one of our members, no one knows where he is, let's go in and find him. And I submit to you that under those facts, they may reasonably, and I believe it is an objective test, Your Honor, I disagree with Mr. Duda. That it's not how much you feel or emote or what kind of actor you are or how much you hype yourself up to believe this is the real thing. I don't think any of that's relevant. I think it's an absolute objective test. Would a reasonable firefighter think this is an emergency? An emergency being somebody could be hurt or could be in danger, and my job is to protect that person. So those firefighters, in my hypothetical situation here, who are going in to find firefighter Gaffney, are responding to an emergency. What is that emergency? It is a simulated training exercise where something has gone wrong, and it becomes an emergency. At that point, Gaffney is his own, he's the public at that point. And he's not a dummy, he's a real person, and that calls for urgent action. And that ties in with the definitions in the previous court cases that have discussed that term. Do you believe this statute is ambiguous? I do not. I don't believe this statutory language that is before you is ambiguous. But I also don't think you even need to worry about that in this case. You don't need to worry about exactly where emergency begins and ends. For instance, in DeRose, the issue about a burglar alarm and the percentage of burglar alarms that are false, and would that be an issue? None of that's an issue in this case, because I submit fundamentally we aren't even to that point in this case. Because these firefighters, although doing, I don't mean to belittle what they were doing in any way, critical training exercises that do involve elements of real danger, they were not doing the kind of act that is covered by this benefit, the statute, the benefit that is awarded by this statute. This statute is a statute that awards a benefit for doing the mission, for being on the mission of public safety, and being either killed or catastrophically injured, that is disabled under this court's decision in Crohe, on that mission, and in these four limited circumstances. Let me now move a little bit on to the procedural issue, because what I'd like to do is, first of all, tell the members of this court that I don't believe you need to reach the procedural issue that is raised in Gaffney unless you desire to do so in order to give guidance to the courts below, which you certainly have the authority to do. But the reason you don't need to decide the issue is because, whether or not a declaratory action under the original jurisdiction of the circuit court, or whether a writ of certiorari is in place for an administrative adjudication, where it has been decided by a unit of local government, in this case, a fire district, whether or not under either set, because Firefighter Leminis, there was no ordinance creating the adjudication procedure in place yet, so there was no adjudication present, or Gaffney where there was, under either case, the issue before you is a pure issue of statutory construction, it is one of law, the review is purely de novo. Even Judge Arnold, in the circuit court below, in her decision in Gaffney, where she upheld the administrative adjudication and dismissed the declaratory count on a motion to dismiss, and considered the review under a writ of certiorari. Even Justice Arnold did the exercise because she had to, based on how the case was pled. But then after going through that exercise and considering it under a writ, she noted, but the issue here is one of law. It's de novo review. So you do not need to decide the procedural issue about whether a unit of local government that has to confer this local right pursuant to this statute has the authority to create an administrative process, which then would go up on a writ of certiorari, okay? You don't need to reach that issue unless you want to. And the issue also, I submit, was raised in the wrong way procedurally in a way that weighs the issue in this court, but you can also overlook that. And the reason I say that is because of this court's prior decision in Dubin versus Personnel Board. That's a case where you have a Chicago employee, and he was being subject to potential discharge under an administrative review that the city of Chicago had set up through its ordinances. And the employee went to the circuit court to file an original action to enjoin what the board was doing, because he didn't like the way the board was conducting this process. And this court said that the circuit court was without jurisdiction to consider that, because there was an administrative process in place. And that deprived the court of original jurisdiction, and it could only come up on a writ of certiorari. And so, if Mr. Duda felt that there is no authority to conduct these hearings, in other words, they're void. There is no authority, not like they're being done wrong, or they're unfair, or whatever. There's no authority to do that. I submit to you, he would have needed to include in his complaint in the circuit court a declaratory judgment that the actual action is void. A prayer that includes that this action, this ordinance, is void. Because then, you could have original jurisdiction in the circuit court. But as long as the ordinance is in place and the process is gone through, I submit to you that the review is under a writ. And that writ allows the court to conduct all kinds of proceedings about how it was done, whether the record is sufficient in order to support the decision, or whether it should be reversed, or anything like that. But as I say, I think you need to attack the ordinance directly in order to get that here, they went through the hearing, it comes up on review, and what Mr. Duda seeks is a declaratory judgment action that he's entitled to the benefits. I think under Dubin, there was no jurisdiction to consider that count. And there's not in any of the pleadings in this case, any kind of prayer for relief that asks for such a declaration. So I don't think it's properly before the court. But moving on to the merits of it, I think if you look at all the situations where you have administrative review under the Administrative Review Act, those are all created by the General Assembly and where the General Assembly creates the process. For example, the pension code. The General Assembly creates the pension boards and provides for how it's supposed to go, and then how it comes up to the courts. But where the process is created by the unit of local government under its authority, whether in the Dubin case, whether it's an employment situation, or whether it's a boat slip permit process, or a business license permit where a hearing process is set up. I submit to you that under those situations, as long as they're within the local government's authority, under its authority, whether it's non-home rule, under the municipal code. In this case, the fire district is given the authority to pass ordinances necessary to do its job and also to administer health benefits. This was a health benefit that it was ordered to create in certain circumstances, so it created a process to deal with adjudicating these very important claims. It's a very important right. It's very important to both the firefighter and the unit of local government, in this case the fire district and its budget. And it wants to conduct it in a manner that is proper and So I submit to you that the authority is there, and that under those circumstances where the unit of local government creates the administrative process, it can't create for itself, actually there's a split on this now, but it can't create for itself review under the Administrative Review Act. And so the courts have said under those circumstances, we're going to consider it under a common law, writ of certiorari, which is effectively the same sort of general review, more like And the essence is to determine what the action below was, and if it is adjudicative in nature, then to take it up on a writ of certiorari. And I believe that the district had that authority. I believe it created it. You know, there's this issue in the record. You can see about whether the attorney for the board that handled the meeting agreed that it wasn't a formal hearing. I mean, I believe the question in the record was, is this a hearing subject to the Administrative Procedure Act, a formal hearing subject to the Administrative Procedure Act? And the answer was no, and of course it wasn't because the ordinance didn't say it was, the ordinance anticipated that the writ would, that it would come up under a writ of certiorari type review. Members of the court, I think what you have here is a situation where this statute is, is designed not to be construed broadly, to be given broadly. It's a different kind of animal. It's a different kind of statute. This is a laurel wreath. This is a, a brass ring. This is a special benefit that is given for those that are actually killed or disabled while they're on the mission of preserving members of the public. I think if you look at it, how it's set up, why it's funded the way it is, you can see it's just, it's absolutely clear that that is, that is the purpose of it. I mean, we just had the, a living Medal of Honor recipient, the first in decades, in the last day. This is certainly not to that level, but it is meant for someone who is on the mission of preserving the public. It's an important mission, and that's exactly why all these kinds of other things, these preparations, are so elaborate. These training exercises are elaborate, and they are realistic, because the mission is so important. But that doesn't turn the preparation into the mission. If you look at movies of, of famous battles, whether we're talking about D-Day, the, the invasion of Normandy, for example, lots of training. Many were undoubtedly hurt in that training. And then you had movies, movies afterward, depicting that day. And all those people who were involved in those were trying to create realism, were trying to create a situation as if they were there. They were putting themselves in the moment. And maybe people were in danger, stunt people were in danger. They were all wanting to get into this moment. But the only thing that was real was the mission itself. And that is what this statute is meant to cover. This benefit is meant to cover those situations, the real ones. Very briefly, I see I'm almost out of time. But when we talk about the training exercises, and whether they can be emergencies, I want to come back to one other thing. And that is that, yes, a training exercise can become an emergency, because something can go wrong. As they're designed, they should never become emergencies, and they're designed carefully to avoid that. But they can become an emergency that could lead to a call. And also, Justice Thomas, your question, that there is a big distinction. I mean, I do believe that if you're, if, that if a firefighter, if the administration set up a training exercise that was simulated to the point to test how these firefighters would react if they thought it was a call, and then could be observed, maybe with cameras or something, and to see how they respond. That could subject, that could be under the act. It would be inconsistent with the national training standards that the fire chiefs have set up, though, because it's deemed too dangerous for that reason. But legally speaking, under the analysis of the objective test that I've proposed to you, that could qualify. And so there is a big difference there. Members of the court, I thank you very much for your time. The fire district thanks you for your time. And if there are no other questions, I will stand down. Thank you. May it please the court, in terms of the speciality of these benefits and the difference in funding, essentially, before the catastrophic injuries to each of these firefighters, they were part of a group insurance plan in the Orland Fire Protection District. Okay? They're part of a group. The premium for that group is paid by the district. After they ceased working, they were both, under other statutory provisions, entitled to remain in the group at the same premium. There's no new insurance that's being triggered by this statute. They're in the group, and under other provisions, they would have to pay the premium. What this statute says is that for these firefighters who are injured while they're responding to what they reasonably believe to be an emergency, not only stay as part of the group, but the employer continues paying the premium. This is not a new insurance policy. The example given by counsel is the difference between the mission and the training, I think, is comparable, Your Honor, to the flight simulator. There are clearly training exercises that are not realistic emergency scenarios that do not involve immediate, imminent physical risk to the firefighter. And those training exercises would not be covered. There would be this sharp distinction between the mission and the training. But that's not what happened in these cases. That's not what happens in these types of drills. These drills are designed to replicate reality. And the hazards that the firefighters face are designed to be exactly the hazards that they face in the community at large. And Officer, or Firefighter Gaffney, to the extent counsel just conceded that even under his theory that if an emergency develops during the training, the firefighter is covered. That's exactly what happened to Firefighter Gaffney. His entanglement in that loveseat was not part of the exercise. It was a new emergency above and beyond the emergency designed by the creators of the statute. Well, to be fair to Mr. Molina, since he can't get up again, I don't think he was describing what happened to Officer Gaffney. I think he was, Firefighter Gaffney, I think he was describing if someone else had to go into that situation to rescue him, it may be an emergency to that person. I understand that. And he created, for this court, the impression that there's a difference. That a firefighter injured rescuing Gaffney would be protected while Gaffney isn't. I'm saying that even under his view of the statute, which I disagree with, Gaffney is on the side of the statute of an unanticipated actual emergency. It was not part of the training exercise that his hose would become entangled in that furniture. That wasn't what anyone intended. No, I'm only making the point that I think- And I have no objection to letting him speak. If there was smoke in the building and if he couldn't get up and somebody else has to go in there and there might be smoke inhalation for Gaffney, that's an emergency situation for the one called to rescue Gaffney. I understand. I mean, if that's what he's saying. But what I'm saying is that where he draws the line, as a matter of logic, is the wrong place. Gaffney's already on the granting benefits side of the line, as the line is drawn by Mr. Molina. And finally, we did file a declaratory judgment challenging the procedure. That's what this case was all about. The reason I didn't seek to enjoin anything is that the board said, this isn't an administrative hearing. I mean, what's there to enjoin when somebody says, I'm not going to do it? I say, are you going to have a formal hearing? And they say, no, we're not having, this is just an investigation. And I go to court and I seek to enjoin a formal hearing. The judges say to me, well, Mr. Duda, what are you here for? They already told you they're not going to do it. Mr. Duda, you did in your complaint, though, request administrative review and the alternative. Prophylactically. I've been doing this for a long time, and my view is, is if I hadn't done that and Judge Arnold had thrown out my declaratory judgment, I wouldn't be here. I'd be out in the street explaining to Mr. Gaffney why he didn't have a case anymore. You received what you requested, right? In the alternative. And alternative pleading is favored in the code. No, that was to protect Tom Duda's malpractice career. Thank you, Your Honor. Thank you. Case number 110012 and 110198 consolidated. Gaffney versus the Board of Trustees of the Orland Fire and Protection District.